IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT J. LASOWSKI, ) | |
| ) | |
| Plaintiff, ) | 05 C 46 |
| ) | |
| v. ) | |
| ) | Hon. Charles R. Norgle |
| WALGREEN COMPANY, ) | |
| an Illinois Corporation, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is Defendant Walgreen Company's Motion for Summary Judgment. For the following reasons, the Motion is granted.

## I. BACKGROUND

### A. Facts

Plaintiff Robert J. Lasowski ("Lasowski") is a white, non-Hispanic male of Polish national origin. Lasowski was born on August 19, 1960. He is a United States citizen and at all times relevant to this case he resided in Chicago, Illinois. Defendant Walgreen Company ("Walgreen") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Walgreen operates a national chain of retail drug stores dealing in pharmaceuticals, including controlled substances, and other consumer goods. Walgreen owns and operates numerous drug stores in Chicago, the surrounding suburbs, and northwest Indiana. Lasowski worked as a Walgreen Assistant Store Manager and Pharmacy Technician from March 18, 1985 until

1

December 12, 2003. During the course of his employment with Walgreen, Lasowski worked at various stores on the south side of Chicago and northwest Indiana. Lasowski last worked at Walgreen's Store #147 (the "Store"), located at 3611 East 106th Street in Chicago.

The following individuals played significant roles in the events leading to the filing of this case. Timothy Culp ("Culp") was the District Manager of Walgreen's District #8, otherwise known as the "Illiana District," which covers areas of Northeast Illinois and Northwest Indiana. As District Manager, Culp managed the operations of the twenty-four Walgreen stores in the Illiana District, including the Store, and he was responsible for the hiring and firing of Walgreen's management personnel in that District. Pedro Villaruel ("Villaruel") was the Store Manager at the Store. Jay Zimny ("Zimny") was the Executive Store Manager at the Store. Dino Ramirez ("Ramirez") was an Assistant Manager at the Store. Belal Zayed ("Zayed") was the Pharmacy Manager at the Store. Sophia Collaros ("Collaros") was a substitute or "floating" pharmacist employed by Walgreen to fill in as the pharmacist when regular store pharmacists were not present. Theodore Mayes ("Mayes") was a Loss Prevention Specialist/Supervisor for Walgreen. In that capacity, Mayes investigated internal losses, indiscretions, and other allegations of misconduct on the part of Walgreen's employees. Benigna Palacios ("Palacios") and Hortensia Garcia ("Garcia") were both Walgreen Assistant Managers who were transferred to the Store in December 2003. Palacios and Garcia are Hispanic females. Palacios was born on April 4, 1976. Garcia was born on September 4, 1961.

The Store's pharmacy is located in the rear of the facility, in an enclosed area set off from the rest of the Store by walls, windows, and a locked door. The pharmacy door is kept locked at all times. During the pharmacy's operational hours, a combination key-pad lock is used by

pharmacy staff, and when the pharmacy is closed, a key lock secures the pharmacy. An emergency pharmacy key is stored in a sealed vial locked in a safe in the Store office. The emergency pharmacy key is accessible only by Walgreen management personnel, including Assistant Managers. This key is intended for use by Walgreen substitute pharmacists.

Walgreen has a detailed written Pharmacy Security Policy (the "Policy"). The Policy provides, *inter alia*:

> An emergency set of keys/combinations to the pharmacy door and safe/cabinet **MUST** be kept in the store safe for use by substitute Pharmacists and/or vacation relief Pharmacists. This policy is for all stores, including 24-hour stores. Where required, the emergency set of keys/combinations must be stored in a lock box within the store safe.

\* \* \*

> No one is permitted in the pharmacy unless a registered Pharmacist is on duty and the person has a legitimate business reason for being in the pharmacy. Entrance to the pharmacy when a Pharmacist is not present is a violation of Company policy. Violators are subject to disciplinary action up to and including termination.

\* \* \*

> If personnel need access to the pharmacy when the pharmacy is closed (i.e. cleaning, inventory, repair, and/or maintenance crews), management **MUST** make sure that a registered Pharmacist is present.

\* \* \*

> If an unauthorized entry into the pharmacy has occurred, management **MUST** call either the Pharmacy Manager or Pharmacy Supervisor (to survey the Pharmacy for losses) who **MUST** then contact the Loss Prevention Specialist.

The Policy provides specific procedures that are to be followed regarding the security of the emergency pharmacy key.

Each store receives an extra pharmacy department key from the Pharmacy Supervisor for use by substitute and vacation relief Pharmacists. This key (or combination) along with the pharmacy safe key (or combination) are kept in a specifically designed vial (see illustration). Initially, the emergency pharmacy department and safe key(s)/combination(s) are handled by the Pharmacy Manager as follows:

1. Label the resealable vial EMERGENCY RX KEY (COMBINATION).
2. Place the emergency pharmacy department and safe/cabinet key(s) [or combination(s) written on a piece of paper] into the vial.
3. Place the cover on the vial and align the predrilled holes.
4. Obtain one door seal from management and insert the narrow end of the seal through the predrilled holes in the vial.
5. Secure the seal by inserting the narrow end through the hole in the seal tag and pulling it tight. Be sure the seal is tight enough so that the lid cannot be removed without breaking the seal.
6. Write the seal number, date, and time in the appropriate spaces on the "Emergency Pharmacy Key (Combination) – Seal Control Log." Print your name and sign in the corresponding spaces (See below).
7. Have management initial the "Emergency Pharmacy Key – Seal Control Log" and then, place the sealed EMERGENCY RX KEY (COMBINATION) vial and seal control form in the store safe.

If it becomes necessary for a Substitute or Vacation Relief Pharmacist to enter a Walgreen's pharmacy, the following procedures are to be followed.

1. Retrieve the **EMERGENCY RX KEY (COMBINATION)** vial from the store safe.
2. Fill in the date and time in the appropriate spaces on the "Emergency Pharmacy Key (Combination) – Seal Control Log." Print your name and sign in the corresponding spaces and have store management initial.
3. After using the extra pharmacy key(s)/combination(s), store management and the substitute Pharmacist must place them in the reusable vial and seal the vial as described above. **Note:** The substitute Pharmacist and store management **MUST** sign and initial the seal control log. The substitute Pharmacist **MUST** return the key/combination to the store safe at the end of the shift assignment.
4. Place the sealed vial and seal control log in the store safe.

On the night of December 7, 2003, Ramirez, not on duty at the Store, left his home in Whiting, Indiana in order to purchase baby formula for his infant son. Many Walgreen's stores in the Illiana District kept baby formula in their locked pharmacies because baby formula was

4

considered a high-theft item. Ramirez first stopped at a Walgreen's store on 119th Street on the south side of Chicago. This was the closest Walgreen's store to Ramirez's home; it was not the Store where Lasowski and Ramirez worked. When Ramirez arrived at the 119th Street Walgreen, the pharmacy was closed and there was no pharmacist on duty. Ramirez requested that store management open the pharmacy so that he could obtain baby formula, but management refused his request. Ramirez then proceeded to the Store. En route to the Store, Ramirez passed a grocery store, but decided not to enter because he was unsure as to whether that grocery stocked the formula he wanted. Ramirez also decided not to proceed to two 24-hour Walgreen's stores in the nearby area, and he also decided not to proceed to an Ultra Foods located in Highlands, Indiana, approximately ten miles from his home. Ramirez was a former employee of the Ultra Foods in Highlands, Indiana, and he was aware that this Ultra sold baby formula.

In his deposition, Ramirez testified that when he proceeded to the Store on December 7, 2003, he was aware that the Store was closed, that no pharmacist was on duty, that in order to purchase baby formula he would have to enter the pharmacy, and that Walgreen's Policy prohibited him from entering the pharmacy when there was no pharmacist on duty. Ramirez further testified that he did not return home to get his keys to the Store and the Store safe because he was aware that he could be fired for using his keys to open and enter the pharmacy when no pharmacist was on duty.

Upon arrival at the Store, Ramirez informed Lasowski that he was out of baby formula, and that he needed Lasowski's help to enter the pharmacy. Lasowski initially refused to open the pharmacy, but after a discussion, Lasowski agreed to do so. The parties dispute how long this discussion lasted. Walgreen asserts that the conversation took between fifteen and thirty

5

minutes, while Lasowski asserts that the conversation took closer to five minutes. The parties agree that during this conversation, Lasowski expressed concern that he and Ramirez would "get in trouble," and that in response, Ramirez indicated he would explain everything to Villaruel the next day, and that Lasowski only would have to open the pharmacy door so that Ramirez could reach in and get the baby formula.

Lasowski then removed the vial containing the emergency pharmacy key from the Store safe and unlocked the pharmacy door. The parties disagree as to who then opened the pharmacy door. Walgreen asserts that Lasowski opened the door, while Lasowski asserts that Ramirez did this. Ramirez then entered the pharmacy, removed a can of baby formula, paid for the formula and left. Before leaving, Ramirez again reassured Lasowski that he would speak with Villaruel the next day and explain everything. Lasowski returned the emergency pharmacy key to the vial with a new numbered seal, and placed the vial and the pharmacy key control log back in the Store safe. Lasowski did not write the new seal number into the key control log.

The next day, December 8, 2003, Lasowski reported the incident to Villaruel and Zimny. Zimny prepared a written statement regarding this incident, but other than that, Villaruel and Zimny apparently took no immediate action. On December 11, 2003, Zayed contacted Mayes and informed him that Collaros had noticed a discrepancy between the number on the pharmacy emergency key vial and the number currently written on the vial log. Zayed also informed Mayes that Lasowski had admitted opening the pharmacy door the night of December 7, 2003. Mayes then traveled to the Store on December 11, 2003 and conducted a Loss Prevention interview with Lasowski, during which Lasowski admitted that he unlocked the pharmacy door and allowed Ramirez to enter the pharmacy. Lasowski also admitted that he returned the emergency

pharmacy key to the vial with a new numbered seal. Mayes then instructed Lasowski to draft a written statement regarding this incident. Lasowski complied. This handwritten statement reads in its entirety as follows.

> At approximately 9 p.m., Dino Ramirez entered the store while not on duty. He worked earlier in the day. He asked me if I could get a can of baby formula from [the] pharmacy that was closed. <u>I told him repeatedly that I did not want to do that</u>. He pleaded that his new born baby needed the baby formula powder immediately. <u>I then opened the pharmacy door with [the] key</u> and he took a can [of formula] off [the] shelf which was by the door on [the] shelf. I did not give him the key and I was present with him. I notified my manager as soon as of [sic] seen him the following morning & gave him the vial seal that was removed.

Lasowski signed this statement at 6:15 p.m. on December 11, 2003. Mayes then contacted Culp, and conveyed his findings. Culp then decided to suspend Lasowski pending further investigation. Zimny informed Lasowski of Culp's decision and took Lasowski's Store keys.

The next day, Mayes conducted a Loss Prevention interview with Ramirez at the Store. Ramirez admitted that Lasowski had unlocked the pharmacy door, and that Ramirez had entered the pharmacy when there was no pharmacist on duty. Ramirez also admitted that he was aware this was a violation of the Policy. At the conclusion of this interview, Villaruel fired Ramirez.

Following the completion of Mayes' Loss Prevention investigation, Culp determined that Lasowski had committed two serious violations of the Policy: entering the pharmacy when no pharmacist was on duty, and neglecting to record the number of the new emergency pharmacy key vial seal he used when replacing the key in the vial after its use. Culp then terminated Lasowski's employment at Walgreen.

Palacios and Garcia eventually replaced Ramirez and Lasowski as Assistant Managers at the Store.

## B. Procedural History

On March 10, 2004, Lasowski filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race, national origin, sex, and age. The EEOC issued Lasowski a Notice of Right to Sue on October 5, 2004. Lasowski timely filed his initial Complaint in the Northern District of Illinois on January 4, 2005. Lasowski filed his Amended Complaint on June 27, 2005. He alleges discrimination based on race, national origin, and sex in violation of Title VII of the Civil Rights Act ("Title VII"), discrimination based on age in violation of the Age Discrimination in Employment Act (the "ADEA"), and retaliatory discharge under state law.

The Executive Committee reassigned this case to Judge Norgle on June 28, 2005. The court denied Walgreen's Motion to Dismiss Counts II and IV on September 16, 2005, but ordered Lasowski to file a More Definite Statement of Facts. Lasowski filed his More Definite Statement on September 30, 2005.

The court referred the case to Magistrate Judge Nolan on March 1, 2006. Magistrate Judge Nolan held a settlement conference on May 8, 2006, but the parties were unable to reach agreement. Magistrate Judge Nolan returned the case to this court the next day. Following a lengthy period of discovery squabbles, the court again referred the case to Magistrate Judge Nolan on March 6, 2008. Having ably resolved these squabbles, Magistrate Judge Nolan returned the case to this court on August 5, 2008.

Walgreen filed its Motion for Summary Judgment on July 18, 2008. The Motion is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Decision

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order to survive a motion for summary judgment, the nonmoving party must identify specific facts that show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. FED. R. CIV. P. 56(c); see also Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996).

When adjudicating a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "[T]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). The court must therefore "look at the evidence as a jury might, construing the record in the light most favorable

to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." Payne, 377 F.3d at 770.

## B. Walgreen's Motion for Summary Judgment

### 1. Lasowski's Title VII Claims

Title VII prohibits employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 56 (2006) (citing 42 U.S.C. § 2000e-2(a)). In order to succeed in a discrimination claim under Title VII, a plaintiff must prove his or her employer's discriminatory intent by direct or indirect evidence. Little v. Ill. Dep't of Revenue, 369 F.3d 1007, 1011 (7th Cir. 2004); see also Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 (7th Cir. 1997). Direct evidence of discriminatory intent is evidence that shows the employer's intent without the need to rely on "inference or presumption." Bahl, 115 F.3d at 1290 n6. Direct evidence is evidence that "speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997). It is likely the case that the only real direct evidence of discriminatory intent is an admission by the employer. Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).

To proceed by means of indirect evidence, a plaintiff must use the familiar McDonnell Douglas burden-shifting method. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under this method, a plaintiff must first establish a prima facie case. A prima facie case of discriminatory termination must show (1) that the plaintiff "is a member of a protected class," (2) that the plaintiff "was meeting [his or her] employer's legitimate performance expectations,"

(3) that he or she "suffered an adverse employment action," and (4) that "his employer sought someone to perform the same work after [he or she] left." Pantoja v. Am. NTN Bearing Manufacturing Corp., 495 F.3d 840, 846 (7th Cir. 2007) (quoting Matthews v. Allis-Chalmers, 769 F.2d 1215, 1217 (7th Cir. 1985)). The court should only address the fourth element of discriminatory termination if the plaintiff has established the second element. See Pantoja, 495 F.3d at 846 ("Once an employee can show . . . that he is meeting his employer's legitimate expectations . . . then the fact that the employer needs to find another person to perform that job after the employee is gone raises [an] inference of discrimination.").

In a case where an individual who is not a member of a protected class alleges employment discrimination, he or she obviously cannot establish the first element of the standard prima facie case. See id. Instead, the plaintiff must show "background circumstances that demonstrate that a particular employer has a reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand." Henry v. Jones, 507 F.3d 558, 564 (7th Cir. 2007) (internal quotation marks and citations omitted). The Seventh Circuit has identified a non-exhaustive list of "background circumstances" that may establish the first element of a prima facie case of reverse discrimination: "where the [individuals] running the company are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in 'diversity . . . .'" Ineichen v. Ameritech, 410 F.3d 956, 960 (7th Cir. 2005) (quoting Preston v. Wisconsin Health Fund, 397 F.3d 539, 542 (7th Cir. 2005)).

If the plaintiff presents a prima facie case, there is a presumption of discrimination, and the burden shifts to the employer to show a "legitimate, nondiscriminatory reason" for the

11

adverse employment action. Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000); see also Little, 369 F.3d at 1011. If the employer can show a facially legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason was pretextual. Stockett, 221 F.3d at 1001; see also Gordon v. United Airlines, 246 F.3d 878, 886 (7th Cir. 2001).

In adjudicating Walgreen's Motion for Summary Judgment as to the Title VII counts, the court's first task is thus to inquire as to whether Lasowski has established a prima facie case of discriminatory termination. The court determines that Lasowski has not done so.

No party disputes that Walgreen terminated Lasowski. The third element of his prima facie case is therefore satisfied. As to the first element of discriminatory termination, since Lasowski is not a member of a protected class, he must show "background circumstances" that tend to demonstrate that Wagreen had a reason to discriminate against white males. See Henry, 507 F.3d at 564.

The parties agree that Walgreen employs a staff of four individuals who comprise the Equal Opportunity Group ("EOG"). The EOG monitors the representation of women, minorities, disabled individuals, and veterans in Walgreen's workforce. Walgreen's objectives with respect to equal opportunity are to assure that its employees are representative of the communities in which its stores are located, especially with respect to women and minorities. To this end, Walgreen, through its EOG, utilizes annual affirmative action plans that track the representation of women and minorities in Walgreen's workforce. Culp, Walgreen's Illiana District[1] Manager and the individual who ultimately fired Lasowski, attended annual meetings regarding

---

[1] The Illiana District has become heavily Hispanic in recent years.

Walgreen's affirmative action plans. Lasowski has therefore satisfied the first element of his prima facie case of discriminatory termination. See Ineichen, 410 F.3d at 960 (affirmative action plans can constitute "background circumstances" of reverse discrimination).

Lasowski, however, cannot satisfy the second element of discriminatory termination: that he was fulfilling Walgreen's legitimate employment expectations. See Pantoja, 495 F.3d at 846. The parties agree that Lasowski routinely received excellent employment evaluations during his tenure at Walgreen. The record in this case, though, reveals that Walgreen had a clear and unequivocal Policy proscribing employees from entering the pharmacy unless a registered pharmacist was on duty. This Policy also provided strict procedures for the use of the emergency pharmacy key. A potential penalty for violating the Policy was termination. Lasowski admits that he violated the Policy by utilizing the emergency pharmacy key to allow Ramirez access to the Store pharmacy when no pharmacist was on duty, and by failing to record the new seal number in the pharmacy key log. The undisputed facts in this case thus demonstrate that Lasowski committed serious violations of the Policy, and was therefore not meeting Walgreen's legitimate employment expectations.

In his deposition, Lasowski repeatedly asserts that he was unaware of Walgreen's proscription against entering the pharmacy when no pharmacist was on duty. Whether or not these assertions are credible is not for the court to decide at the summary judgment stage of this litigation. See Payne, 377 F.3d at 770. However, Lasowski admits that some of Walgreen's security policy documents were available to him online, that he had been assigned online training specific to his level of responsibility, and that as an Assistant Manager, he had been trained in the proper use of the emergency pharmacy key. Drawing all reasonable inferences in favor of

13

Lasowski, see Perdomo, 67 F.3d at 144, there is still no question that as a Walgreen's Assistant Manager, and after nearly fifteen years as a Walgreen's employee, Lasowski should have been aware of the Policy's proscription against entering the pharmacy when no pharmacist was present, and he should also have been aware of the Policy's procedures for the handling of the emergency pharmacy key.

Even though Laswski has not established a prima facie case of discriminatory termination, the court, with an abundance of caution, will complete the burden-shifting analysis. Assuming that Lasowski has made out a prima facie case of discriminatory discharge, the burden shifts to Walgreen to show a "legitimate, non-discriminatory reason" for his firing. Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000). To meet this burden, Walgreen must "only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision was not motivated by discriminatory animus." See id. (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981)). Walgreen has met this burden by presenting evidence that it fired Lasowski because he violated the Policy. Thus the burden shifts back to Lasowski to show that this purported reason for his firing is pretextual. See Stockett, 221 F.3d at 1001.

In order to establish that an employer's stated reasons for terminating an employee are pretextual, "a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show that the employer lied about its proffered explanation." Johnson v. Nordstrom, Inc., 260 F.3d 727, 732 (7th Cir. 2001). The plaintiff must either show direct evidence that the reason given for the termination was a lie, or prove pretext indirectly by showing one of the following: "(1) Defendant's explanation of Plaintiff's discharge had no basis

14

in fact, or (2) the explanation was not the 'real' reason, or (3) . . . the reason stated was insufficient to warrant the [termination]." Id.; see also Bahl, 115 F.3d at 1291; Lenoir v. Roll Coaster, Inc., 13 F.3d 1130, 1133 (7th Cir. 1994).

Lasowski has presented no direct evidence that Walgreen's stated reason for his termination was pretext, or a lie. See Bahl, 115 F.3d at 1290n.6 (direct evidence proves a fact without the need for "inference or presumption"). Since Lasowski has presented no direct evidence of pretext, he must establish pretext indirectly by making one of the three showings noted above. This Lasowski cannot do. First, Walgreen's proffered explanation for firing Lasowski clearly has a basis in fact, as Lasowski has admitted his violations of the Policy. Second, Lasowski has not provided any evidence that the December 7, 2003 incident was not the "real" reason he was fired. Ramirez was fired for his participation in this incident as well, and Walgreen has provided unrebutted evidence that in May 2003 Culp fired an employee, Colleen Anna-Fabian ("Anna-Fabian"), at an Illiana District Walgreen's store in Sauk Village, Illinois for entering the pharmacy in violation of the Policy. Although Walgreen's Loss Prevention personnel predicated their investigation into Ann-Fabian's violation of the Policy on shortages of controlled substances in that store's pharmacy, the undisputed evidence establishes that Culp terminated Anna-Fabian because she entered the pharmacy without authorization and without a pharmacist present. Third, the Policy clearly states termination is a potential penalty for entering a Walgreen's pharmacy without authorization when no pharmacist is present. The propriety of Walgreen's business decision to institute the Policy, and to terminate these individuals for violating it, is not an issue properly before the court. See Petts v. Rockledge Furniture LLC, 534 F.3d 715, 724 (7th Cir. 2008) ("we do not sit as a superpersonnel department with authority to

correct an employer's decision that is unwise or unfair.") (quoting Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 697 (7th Cir. 2006)); Gordon v. United Airlines, Inc., 246 F.3d 878, 889 (7th Cir. 2001).[2]

Lasowski thus cannot establish a prima facie case of discriminatory termination on the basis of race, national origin, or gender, and even if he could, he cannot establish that Walgreen's proffered reasons for terminating him are pretextual. Lasowski's claims of discriminatory termination under Title VII therefore fail.

### 2. Lasowski's ADEA Claim

The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Ky. Ret. Sys. v. EEOC, 128 S. Ct. 2361, 2366 (2008) (quoting 29 U.S.C. § 623(a)(1)). This statute "protects employees who are at least forty years old." Metz v. Transit Mix, Inc., 828 F.2d 1202, 1204 n.3 (7th Cir. 1987) (citing 29 U.S.C. § 631(a)). Where an ADEA plaintiff claims "disparate treatment," which is intentional discrimination based on age, the plaintiff must demonstrate that age "actually motivated the employer's decision." Ky. Ret. Sys., 128 S. Ct. at 2366 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)). Claims of "disparate impact," on the other hand, allow recovery for "employment practices that are facially neutral in their treatment .

---

[2] In his deposition, Lasowski testified that he observed a manager at another Walgreen's store routinely enter the pharmacy when no pharmacist was on duty. However, Lasowski testified that he was unclear as to when these incidents may have occurred, but that this may have happened at some unspecified point in the 1980's. There is no indication in the record that Lasowski or any other Walgreen's employee ever made anyone in Walgreen's Loss Prevention department aware of these incidents.

16

.. of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336 n.15 (1977).[3]

Lasowski's claim is one of disparate treatment. He must therefore show that Walgreen's decision to terminate him "was motivated by a discriminatory animus; that is, [Lasowski] may recover only if his [] age was a determining factor in [Walgreen's] decision." See Metz, 828 F.2d at 1204; Ky. Ret. Sys., 128 S. Ct. at 2361 ("a plaintiff alleging disparate treatment cannot succeed unless the employee's age 'actually played a role in that process and had a determinative influence on the outcome.'") (quoting Hazen Paper, 507 U.S. at 610).

Since Lasowski has presented the court with no direct evidence of discrimination based on age, he must establish his claim by means of the McDonnell Douglas burden-shifting approach. Using the McDonnell Douglass framework, Lasowski must first establish a prima facie case of age based discriminatory termination. The elements of this claim are: (1) the employee is over forty years of age; (2) the employee was performing satisfactorily; (3) the employee suffered an adverse employment action; and (4) the "employee was treated less favorably than younger, similarly situated employees." Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 574 (7th Cir. 2003). The Seventh Circuit has, over the years, formulated slightly different versions of the fourth element of this cause of action. In Coco v. Elmwood Care, Inc., the Seventh Circuit indicated that a plaintiff alleging discriminatory termination based on age had to show that he or she was "replaced by a much younger person." 128 F.3d 1177, 1178 (7th Cir.

---

[3] The disparate impact analysis also applies to Title VII cases. Metz, 828 F.2d at 1204 n.4.

17

1997). In Pantoja, the Seventh Circuit explained that the plaintiff in a discriminatory termination case must demonstrate that "his employer sought someone else to perform the same work after he left." 495 F.3d at 846 (quoting Matthwes, 769 F.2d at 1217). As the court has already indicated, because Lasowski cannot meet the second element of a prima facie case of discrimination, the precise formulation of the fourth element of discriminatory termination based on age is of no consequence in this case.

Because Lasowski was born August 19, 1960, and terminated at some point in December 2003, he has met the first and third elements of his prima facie case. However, as the court has explained, the undisputed evidence in this case indicates that Lasowski was involved in a serious violation of the Policy, and was therefore not performing his job duties in a satisfactory manner. The court has also already determined that Lasowski cannot show that Walgreen's stated reasons for terminating him were pretextual. Lasowski thus cannot show that his age "actually played a role" in Walgreen's decision to fire him. See Hazen Paper, 507 U.S. at 610. Lasowski's age discrimination claim therefore fails.

### 3. Lasowski's State Law Claim of Retaliatory Discharge

Under Illinois law, the tort of retaliatory discharge provides a cause of action when an individual is terminated "in retaliation for his activities and [] his discharge violates a clear mandate of public policy." Barr v. Kelso-Burnett Co., 478 N.E.2d 1354, 1358 (Ill. 1985). This tort provides an exception to the general rule in Illinois that "at will" employees are subject to termination at any time for virtually any reason. Palmateer v. International Harvester Co., 421 N.E.2d 876, 878 (Ill. 1981).

The "activities" to which the Illinois Supreme Court refers are the exercise of plaintiff's "constitutional and statutory rights." Barr, 478 N.E.2d at 1358. Illinois courts have recognized the tort of retaliatory discharge where employees have been terminated for the following "activities": filing a worker's compensation claim, Kelsay v. Motorola, Inc., 384 N.E.2d 353 (Ill. 1978), reporting criminal activity to law enforcement authorities, Palmateer, 421 N.E.2d at 876, reporting criminal activity to corporate superiors, Petrik v. Monarch Printing Corp., 444 N.E.2d 588 (Ill. 1982), and refusing to work under conditions that violate government mandated safety codes, Wheeler v. Caterpillar Tractor Co., 485 N.E.2d 372 (Ill. 1985). The notion of "public policy" to which the Illinois Supreme Court refers is not precisely defined, but "concerns what is right and just and what affects the citizens of the state collectively." Palmateer, 421 N.E.2d at 878. By way of example, the Palmateer court surveyed decisions from other state courts that found valid causes of action for retaliatory discharge where plaintiffs were terminated for the following "activities": refusing to commit perjury, Petermann v. International Brotherhood of Teamsters Local 396, 344 P.2d 25 (Cal. 1959), refusing to engage in price fixing, Tameny v. Atlantic Richfield Co., 610 P.2d 1330 (Cal. 1980), refusing to violate a consumer credit code, Harless v. First National Bank, 246 S.E.2d 270 (W. Va. 1978), refusing to practice medicine without a license, O'Sullivan v. Mallon, 390 A.2d 149 (N.J. 1978), and refusing to evade jury duty, Nees v. Hocks, 536 P.2d 512 (Or. 1975). Id.

Illinois has declined the invitation to apply the "three-tier allocation of proof standard" that federal courts apply in Title VII and ADEA cases to the tort of retaliatory discharge. Clemons v. Mechanical Devices Co., 704 N.E.2d 403, 407-08 (Ill. 1998). Instead, retaliatory discharge cases are to be adjudicated "using traditional tort analysis." Id. at 408.

19

In this case, Lasowski has presented the court with no evidence that his discharge resulted from any constitutional or statutorily protected "activity" akin to the ones described by the Kelsay, Palmateer, Petrik, or Wheeler courts. Instead, all the available evidence in this case indicates that Lasowski was fired for using the emergency pharmacy key to allow Ramirez into the pharmacy when no pharmacist was on duty on December 7, 2003, and for failing to record the new seal number in the pharmacy key log, in clear violation of the Policy. Lasowski's violations of the Policy in no way affected the citizens of Illinois in any collective manner, and his resulting discharge cannot therefore be said to have violated any public policy. See Barr, 478 N.E.2d at 1358; Palmateer, 421 N.E.2d at 878. Lasowski's state law claim of retaliatory discharge therefore fails.

### III. CONCLUSION

For the foregoing reasons, Walgreen's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: November 18, 2008